1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WEYERHAEUSER COMPANY, INC.,

          Plaintiff,

    v.

ACCURATE RECYCLING CORP.,

          Defendant.

No. C06-922 MJP

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

      This matter comes before the Court on the parties' motions for summary judgment.  (Dkt. Nos. 44, 47, 48.)  After reviewing the motions, the parties' responses (Dkt. Nos. 51, 53, 55), the parties' replies (Dkt. Nos. 56, 58), all documents submitted in support thereof, and after hearing oral argument by the parties, the Court DENIES Defendant's motions for summary judgment and DENIES in part and GRANTS in part Plaintiff's motion for partial summary judgment.

**Background**

      This case involves disputes over two contracts Plaintiff Weyerhaeuser Company, Inc. ("Weyerhaeuser") entered into with Defendant Accurate Recycling Corp. ("Accurate") for the purchase of recyclable materials ("OCC").  A contract signed in July 2005 stated that Weyerhaeuser would purchase from Accurate all the OCC generated by Pathmark grocery stores (the "Pathmark Contract").  (Dkt. No. 55, Ex. 1.)  A contract signed in August 2005 stated that Weyerhaeuser would

1   purchase from Accurate a set tonnage of OCC generated at Accurate's Lansdowne Plant (the

2   "Lansdowne Contract").  (Dkt. No. 55, Ex. 2.)  Both Contracts stated that Weyerhaeuser was under

3   no obligation to purchase OCC which did not meet certain quality specifications and included a clause

4   stating that the Contract could only be modified by a writing signed by both parties.

5          After the closing of its Plymouth mill in November 2005, Weyerhaeuser communicated to

6   Accurate that it could no longer process the Pathmark and Lansdowne OCC and that it was

7   considering a force majeure defense to invalidate both contracts.  (Dkt. No. 55, Ex. 5.)  On December

8   29, 2005, Accurate sent a "notice of default" to Scott Engstrom stating its belief that Weyerhaeuser

9   was obligated to maintain both the Pathmark and Lansdownde contracts despite the mill shutdown.

10   (Id.)  After oral communications between the parties in January and February 2006, Weyerhaeuser

11   employee Scott Engstrom drafted an amendment to the Pathmark Contract which both parties signed

12   on February 9, 2006.  (Dkt. No. 55, Ex. 7.)  The amendment lowered the contract price for OCC and

13   reduced the Pathmark contract by one year, making it a two year contract instead of three.  (Id.)  The

14   amendment made no mention of the Lansdowne Contract.  (Id.)

15          On February 13, 2006, Weyerhaeuser closed its Plymouth mill.  Weyerhaeuser continued to

16   purchase the Pathmark OCC from Accurate but instead of processing the OCC itself, Weyerhaeuser

17   sold the OCC to Recycled Fibers which processed the OCC in its U.S. Gypsum mill.  Sometime in the

18   beginning of March, employees of the Gypsum mill began complaining of the quality of Pathmark's

19   OCC alleging that it was contaminated with wax and could not be processed.  (See Dkt. No. 55, Ex.

20   10.)  After a series of email exchanges on the wax issue, Weyerhaeuser informed Accurate that it

21   needed to decrease the amount of OCC purchased from Pathmark and would no longer accept OCC

22   from Pathmark's KDC and AMA distribution centers.  (Dkt. No. 55, Exs. 12-18.)  Weyerhaeuser

23   continued to receive and process OCC from Pathmark's third distribution center, the Blair Road

24   location.  (Dkt. No. 55, Ex. 9 at 70.)  Sometime in April 2007, the Gypsum mill was no longer

25   reporting problems with wax.  (Dkt. No. 55, Ex. 9 at 78.)

ORDER - 2

1    After Weyerhaeuser notified Accurate that it would not purchase OCC from Pathmark's KDC

2    and AMA locations, Accurate began selling that OCC to Visy Paper for a price lower than that

3    contained in the Pathmark Contract.  (Def. Mot. for Summ. J. Re: July 2005 Contract at 9.)  Accurate

4    concluded that Weyerhaeuser had breached the Pathmark contract in refusing to purchase the AMA

5    and KDC OCC and sent Weyerhaeuser a notice of default on June 1, 2006.  (Dkt. No. 47, Ex. 8.)

6    Weyerhaeuser responded with its own notice of default on June 13, 2006 alleging that Accurate had

7    breached the Contract by failing to meet the quality standards and minimum required tonnage set out

8    in the Contract.  (Dkt. 47, Ex. 9.)

9    After Weyerhaeuser's Plymouth mill closed on February 13, 2006, Weyerhaeuser did not

10   purchase any Lansdowne OCC from Accurate; instead, Accurate sold the Lansdowne OCC to Visy

11   Papers.  On March 14, 2006, Accurate's President David Lasensky sent an email indicating an agreed

12   rescission of that Contract:  "The conclusion Scott [Engstrom] and myself agreed to, was to allow

13   Weyerhaeuser to negate the Lansdowne contract and likewise, reduce the Pathmark contract by one

14   (1) year."  (Dkt. No. 59, Ex. B.)  On June 1, 2006, Accurate sent Weyerhaeuser written notice that it

15   was in breach of the Lansdowne agreement.  (Dkt. No. 59, Ex. L.)

16   Weyerhaeuser filed this action alleging that Accurate breached the Pathmark Contract when it

17   failed to supply OCC meeting the quality standards set out in the Contract.  (Dkt. No. 1.)  Accurate

18   responded with a counter-claim alleging that Weyerhaeuser breached both the Pathmark and

19   Lansdowne Contracts.  (Dkt. No. 17.)  Both parties have filed motions for summary judgment.  Rule

20   56(c) provides, in part, that summary judgment is appropriate if "the pleadings, depositions, answers

21   to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

22   genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

23   law."  Fed. R. Civ. P. 56(c) (2003).  While "some alleged factual dispute between the parties will not

24   defeat" a motion for summary judgment, "disputes over facts that might affect the outcome of the suit

25

1  . . . will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477

2  U.S. 242, 247-48 (1986).

3  **I.  Accurate's Motion for Summary Judgment Regarding the Pathmark Contract**

4          Two provisions from the Pathmark Contract are relevant to this analysis.  Section Five of the

5  Contract requires that all delivered OCC meet certain quality specifications and states that

6  Weyerhaeuser is not obligated to purchase OCC which does not.  (Dkt. No. 52, Ex. A at 5.)  Section

7  Fourteen details the Contract's Default Provision, allowing a party thirty days to cure a non-monetary

8  breach of the agreement after receiving written notification that it has defaulted.  (Dkt. No. 52, Ex. A

9  at 6.)   Accurate asserts that it did not breach the Pathmark Contract because it cured the problem of

10  wax-contaminated OCC within thirty days of notification.

11          There is an issue of material fact as to when Weyerhaeuser gave Accurate written notice that

12  the Pathmark OCC did not comply with the quality standards in the Contract.  Accurate argues that

13  Weyerhaeuser did not provide written notice of default until June 13, 2006.  Weyerhaeuser claims that

14  it provided written notification by email in March 2006.

15          The record does not clearly indicate when Accurate first received notification that the OCC

16  from Pathmark was contaminated with large quantities of wax.  In an email dated March 7, 2006 a

17  Weyerhaeuser employee, Russell Spencer, notified an Accurate employee, Jenny Laut, that he and the

18  manager of the Gypsum mill had decided upon an approach to dealing with the wax problem.  (Dkt.

19  No. 52, Ex. B.)  This email does not introduce the problem to Ms. Laut and thereby suggests that

20  Accurate had been previously informed of the wax issue.

21          Neither does the record clearly indicate when the problem of wax contaminated OCC was

22  resolved.  Accurate relies on the deposition testimony of Weyerhaeuser employees Brian Heckel and

23  Scott Engstrom in asserting that the wax problems were cured by April 7, 2006, "one month from the

24  date of the first complaint."  (Def.'s Mot. Re: July 2005 Contract at 7.)  The evidence is not as clear as

25  Accurate contends.  The testimony of Mr. Heckel states only that "[w]e can certainly presume and

1   assume that the wax problem ended, if not [on April 7th,] close to that time frame." (Dkt. No. 47, Ex.

2   3 at 78.)  Mr. Heckel's testimony merely states that the problem was solved sometime after mid-April

3   2006. (Dkt. No. 47, Ex. 7 at 55.)

4          Finally, there is an issue of material fact as to whether Accurate was responsible for curing the

5   breach.  Accurate claims that the wax problems were cured by April 7, 2006 but Weyerhaeuser

6   attributes that result to its decision to discontinue the processing of OCC from the KDC and AMA

7   Pathmark locations.  Weyerhaeuser had no obligation to purchase OCC from Accurate which did not

8   meet the quality specifications required by the contract.  If Weyerhaeuser's decision to reject the OCC

9   from Pathmark's KDC and AMA locations resolved the wax problem, then Accurate cannot be said to

10  have cured its breach of the Contract.

11  **II.  <u>Accurate's Motion for Summary Judgment Regarding the Lansdowne Contract</u>**

12         Accurate asks the Court to decide as a matter of law that Weyerhaeuser is in breach of the

13  Lansdowne Contract.  Weyerhaeuser has not purchased any Lansdowne OCC since February 13,

14  2006, the day Weyerhaeuser's Plymouth mill closed.

15         Weyerhaeuser asserts that it made an oral agreement with Accurate to rescind the Lansdowne

16  Contract in February 2006.  Section 17(h) of the Contract states that it can only be modified in a

17  writing signed by the parties and no such written modification exists.  However, both Weyerhaeuser

18  and Accurate altered their performance after February 13, 2006 and ceased operating under the terms

19  of the Lansdowne Contract.  Weyerhaeuser stopped receiving the Lansdowne OCC and Accurate

20  found another purchaser for it.

21         An attempt at rescission which does not satisfy a contract's signed writing requirement may

22  operate as a waiver.  RCW 62A.2-209(4).  Washington contract law recognizes a waiver as "the

23  intentional and voluntary relinquishment of a known right." <u>Jones v. Best</u>, 134 Wn.2d 232 (Wash.

24  1998).  There is a genuine issue of material fact as to whether such a waiver was effected because the

25  parties contest the substance of the oral agreement between David Lasensky and Scott Engstrom.

ORDER - 5

1  Accurate asserts that Mr. Lasensky "did have discussions with Mr. Engstrom about releasing

2  Weyerhaeuser from the Lansdowne Contract in exchange for a favorable negotiation of the Pathmark

3  Contract" but that, ultimately, Accurate never agreed to the release.  Lasensky Decl. at 2 ¶ 7.

4  Weyerhaeuser gives an opposite account of the facts.  Until the facts are resolved, the issue cannot be

5  decided as a matter of law.

6  **III.  Weyerhaeuser's Motion for Partial Summary Judgment**

7       Weyerhaeuser seeks summary judgment on four of Accurate's claims for damages.

8       **1.  Damages from Alleged Losses Related to Sears, Home Depot and K-Mart**

9       Accurate stipulates to forego its damages regarding K-Mart, Home Depot and Sears.   (Dkt.

10 No. 55 at 3.)

11      **2.  Damages for the Alleged Loss of the Pathmark Relationship Beyond June 30, 2007**

12      Weyerhaeuser asks the Court to limit Accurate's damage claims under the Pathmark Contract

13 to the terms of the February amendment reducing the length of the Contract from three years to two.

14 Weyerhaeuser's motion on this point is granted.

15      Accurate argues that it only agreed to the modification in an attempt to mitigate damages it

16 would suffer if Weyerhaeuser breached the Contract altogether.  Because Weyerhaeuser was not in

17 breach of the Contract on February 9, 2006 when the amendment was signed, the doctrine of

18 mitigation of damages does not apply to Accurate's actions.  Instead, Accurate waived its right to

19 enforce the original Contract when it signed the February 9th amendment modifying the Pathmark

20 Contract.

21      The written amendment comports with Section 17(h) of the Contract which requires that any

22 modification be contained in a writing signed by both parties.  An agreement modifying a contract

23 does not need any consideration to be binding.  RCW 62A.2-209(1).  The February 9, 2006

24 amendment to the Pathmark Contract was properly executed and is binding on the parties, therefore

25 Accurate cannot seek damages under the Pathmark Contract beyond June 30, 2007.

ORDER - 6

1    **3. Damages Resulting from Weyerhaeuser's Diversion of the KDC and AMA OCC**

2         In March 2006, Weyerhaeuser and Accurate communicated by email about Pathmark's wax-

3    contaminated OCC and the Gypsum Mill's inability to process it. (Dkt. No. 55, Ex. 12, Ex. 13, Ex.

4    14.)  On March 17, 2006, Mike Carey of Accurate sent a proposal to Weyerhaeuser suggesting that

5    Accurate would take on the responsibility for marketing the AMA and KDC OCC if Weyerhaeuser

6    would agree to pay Accurate $2.50 per ton until the expiration of the Pathmark Contract.  (Dkt. No.

7    55, Ex. 15.)  Weyerhaeuser did not sign the proposal.  On Wednesday, March 21, 2006, Mr. Heckel

8    sent an email to Mike Carey of Accurate:

9         Per our telephone conversation today we confirm the following:

10        Pathmark's KDC and AMA locations will be serviced by Accurate Recycling
          effective Monday, March 27, 2006.  Weyerhaeuser will no longer have any
11        contractual obligations to service these two locations.  Weyerhaeuser will continue
          to service Pathmark's Blair Road location as per the terms of our contract with
12        Accurate Recycling.

13        Weyerhaeuser agrees to pay Accurate the contractual pricing for material shipped
          from the KDC and AMA prior to March 27th, 2006.
14
          Please review and reply via return email your confirmation of these terms.
15

16   (Dkt. No. 55, Ex. 17.)  There is no evidence in the record that Mr. Carey ever responded directly to

17   this email.  Instead, in a separate email string, Mr. Heckel of Weyerhaeuser sought confirmation from

18   Mr. Carey that "Accurate will be taking over the servicing of Pathmark's KDC and AMA locations

19   effective Mon. March 27." (Dkt. No. 55, Ex. 18.)  Mr. Carey responded on March 24, 2006 and

20   stated that "it is my intent to start hauling the AMA and KDC locations directly with Accurate trucks

21   starting Monday March 27th, 2006.  I am waiting for the final approval from Pathmark."  (Id.)

22        Weyerhaeuser asserts that these communications constitute a written modification to the

23   Pathmark Contract.  Accurate argues that Weyerhaeuser made a unilateral decision to divert the KDC

24   and AMA tonnage from Gypsum in violation of its contractual obligations and insists that it undertook

25

1  efforts to secure an alternative contract for the KDC and AMA location only as part of its duty to

2  mitigate the damages caused by Weyerhaeuser's breach.

3       The Pathmark Contract states that the Contract can only be modified "in writing signed by the

4  parties." (Dkt. No. 55, Ex. 1.)  While there is no evidence of a signed writing releasing Weyerhaeuser

5  from its contractual obligation to purchase the KDC and AMA OCC, it is not clear whether the parties

6  came to an oral agreement on the issue.  The Washington UCC states that an attempted modification

7  which does not satisfy a contract's signed writing requirement may operate as a waiver.  RCW 62A.2-

8  209(4).  Both Weyerhaeuser and Accurate modified their performance after the oral and written

9  communications relayed above.  Weyerhaeuser ceased purchasing and servicing the KDC and AMA

10  OCC and Accurate contracted with Visy Paper for the purchase and processing of that OCC.  If it is

11  found that the parties did reach an oral agreement, the Contract's signed writing provision should not

12  limit "the legal effect of the parties' later conduct."  RCW 62A.2-209, Comment 4.  Whether the

13  parties' communications and subsequent conduct constitute Weyerhaeuser's release from its obligation

14  to service Pathmark's KDC and AMA OCC is an issue of fact and cannot be decided as a matter of

15  law.

16       **4.  Damages Under the Lansdowne Contract**

17       As stated above, there is an issue of material fact as to whether Accurate waived its rights

18  under the Lansdowne contract.  Weyerhaeuser's motion asking the Court to deny Accurate damages

19  under the Contract is denied as the issue cannot be decided on summary judgment.

20                    **Conclusion**

21       The Court DENIES Defendant's motions for summary judgment because there are issues of

22  fact which must be determined before the Court can make a legal finding.  The Court GRANTS

23  Plaintiff's motion for summary judgment on the issue of damages under the Pathmark Contract:

24  Accurate will be bound to the written amendment to that Contract and cannot seek damages beyond

25  June 30, 2007.  The Court DENIES Plaintiff's motion for summary judgment on the issues of damages

ORDER - 8

1    resulting from diversion of the KDC and AMA OCC and damages under the Lansdowne Contract

2    because there are issues of fact unresolved.

3

4              The Clerk is directed to send copies of this order to all counsel of record.

5              Dated:   November 21, 2007.

6

7

8                                                    Marsha J. Pechman
                                                     U.S. District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ORDER - 9